2020 IL App (1st) 171810-U

SECOND DIVISION
January 28, 2020

No. 1-17-1810

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2013 CR 18068 |
| JOHNATHAN SUAREZ, | ) ) | |
| Defendant-Appellant. | ) ) ) | The Honorable Timothy J. Joyce, Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* The defendant's armed robbery and aggravated kidnaping convictions are affirmed where: (1) the record on direct appeal is insufficient to determine whether trial counsel was ineffective by operating under a conflict of interest and by failing to investigate the case; (2) trial counsel was not ineffective by not objecting to two out-of-court statements, where the statements were not prejudicial; (3) trial counsel was not ineffective for inadequately impeaching one of the State's witnesses, where the scope of trial counsel's cross-examination of the witness was a matter of trial strategy; and (4) the defendant failed to show that allegedly "prejudicial" remarks and testimony would have been inadmissible.

¶ 2 Following a jury trial, defendant Johnathan Suarez was convicted of armed robbery and aggravated kidnaping and sentenced to concurrent prison terms of 22- and 10-years respectively. On appeal, Suarez claims that he received ineffective assistance of trial counsel where counsel: (1) represented him under a conflict of interest by simultaneously representing a witness in the case; (2) failed to adequately investigate Suarez's case; (3) failed to object to inadmissible hearsay statements elicited by the State; (4) failed to impeach one of the State's witnesses with prior inconsistent statements and contradictory evidence; and (5) allowed the State to introduce prejudicial evidence. For the reasons that follow, we affirm.

¶ 3                                            BACKGROUND

¶ 4 On September 23, 2013, Suarez and codefendants[1] Sergio Castro and Alfonzo Harris were charged by indictment with one count of armed robbery (720 ILCS 5/18-2(a)(1) (West 2012)) and two counts of aggravated kidnaping (720 ILCS 5/10-2(a)(4) (West 2012)), following an incident in Chicago on July 16, 2013. Suarez and Castro were tried simultaneously before separate juries, and Harris received an entirely separate trial proceeding.[2]

¶ 5 Prior to trial, Suarez brought a motion to suppress his confession, alleging that he: (1) was locked in a small room for several hours; (2) was denied requests to make a phone call and consult an attorney; and (3) was not read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In a supplemental motion to suppress, Suarez claimed that the police officers lacked probable cause when they arrested him at the Chevrolet dealership where the robbery occurred. Suarez's codefendants also filed motions to suppress.

---

[1] None of Suarez's codefendants are party to this appeal.
[2] The record reflects that two more individuals, Charles LeBlanc and Johnny Coleman, were also suspected of being involved in the robbery at issue in this case. LeBlanc was not included in the same charging instrument, and the record suggests he was scheduled for a separate bench trial. The record contains few details regarding Coleman's proceedings, other than the fact that Coleman was not charged in the same case as Suarez.

¶ 6      At a hearing on the motions of Suarez and his codefendants, the State called Chicago police officer Mark Tamlo. Officer Tamlo testified that on August 23, 2013, at about 4:20 p.m., he received an assignment "[t]o go and seek out Mr. Jonathan [*sic*] Suarez" at the Chevrolet dealership located on the 6600 block of South Western Avenue. Officer Tamlo and his partner, Officer Lance Rezny, drove an unmarked vehicle to the dealership.

¶ 7      At the dealership, the two officers met with Suarez in the dealership owner's office.  Officer Tamlo informed Suarez that his "sergeant would like to speak with him" about a robbery that had occurred at the dealership and asked whether Suarez "would like to come in for an interview." Suarez agreed to the interview, walked with Officers Tamlo and Rezny to their unmarked vehicle, from where he was transported to the police station. Officer Tamlo stated that he did not handcuff Suarez at any point and confirmed that Suarez was "free to leave" or "to not go" to the police station. The officer further denied that he made any promises or threats to Suarez or lied to Suarez about the investigation while driving to the station. At the station, Officer Tamlo left Suarez with Sergeant Edward Wodnicki in the police station's victim interview room. Twelve hours later, Officer Tamlo prepared an arrest report after learning Suarez had confessed to the robbery.

¶ 8      Officer Tamlo confirmed that he never read Suarez his *Miranda* warnings, and that he was not aware that Officer Rezny ever did so.  The officer, however, denied that Suarez ever asked to make a phone call, or to speak with an attorney.

¶ 9      Officer Tamlo further testified that the following day, on August 24, 2013, at about 5 p.m., together with is partner he drove to the house of codefendant Castro, who agreed to an interview and cooperatively went to the police station with no handcuffs. That same day, the two officers also arrested codefendant Harris, handcuffed him, and transported him to the police station. Officer

Tamlo averred that within a few minutes of bringing codefendant Castro to the police station, Sergeant Wodnicki informed him that Castro had confessed to the robbery.

¶ 10    On cross-examination, Officer Tamlo indicated that he went to the dealership on August 23 at 4:20 p.m. because Sergeant Wodnicki told him "it was [Suarez's] last day at work there, and he was picking up his last check." Officer Tamlo admitted that at the dealership he had a visible police badge, vest, and firearm, and that he identified himself as a police officer to Suarez.  On cross-examination, Officer Tamlo further acknowledged that after working on the case for "16 hours that day," he mistakenly wrote in his arrest report that Suarez was "arrested" at the dealership.  Officer Tamlo claimed that contrary to that arrest report Suarez had not actually been arrested until he was at the police station. On redirect examination, he pointed out that the same arrest report also stated that Suarez was fingerprinted and received in lock up on August 24, 2013, after 4:30 a.m.

¶ 11    Sergeant Wodnicki next testified that he was assigned as the primary investigator of the armed robbery at the Chevrolet dealership that occurred on July 16, 2013. From July 17 to August 23, 2013, Sergeant Wodnicki visited the alleged victims of the robbery, as well as spoke to Mike Helmstetter, the "general manager/part owner of the dealership," the salesmen, sales managers, cashier staff, front office staff, managers of accounting, employees who worked with the victims or were "involved in this robbery in one way or another," and "pretty much anyone and everybody that had something to do with that cashier's office."

¶ 12    On August 23, 2013, at about 1 p.m., Sergeant Wodnicki received a telephone call from Helmstetter, with whom he had previously met, and was told that Suarez, "one of the people that was originally listed as a victim on the case report," was on his way to pick up his final termination check. Helmstetter also told the sergeant there was a "rumor around the dealership" that Suarez

participated in the robbery and was not a victim. Sergeant Wodnicki instructed Officers Tamlo and Rezny to drive to the dealership, meet with Helmstetter, talk to Suarez, and "[s]ee if they could convince [Suarez] to come into the station for an interview." Sergeant Wodnicki denied telling the officers to arrest Suarez because there was no "concrete evidence" to support the arrest.

¶ 13    According to the sergeant, later that day, at about 5:15 p.m., he interviewed Suarez. Sergeant Wodnicki testified that during this interview Suarez was not handcuffed and appeared "excited and anxious, and very talkative." The sergeant averred that he Mirandized Suarez because of the "suspicions" he had that Suarez was involved in the robbery. He claimed that Officcer Tamlo was present when Suarez was read his rights. The sergeant also confirmed that Suarez never asked to make a telephone call or consult an attorney. According to Sergeant Wodnicki, Suarez initially denied that he was involved with the robbery, but the sergeant told him he that "didn't believe him." "[M]aybe a half hour" into the interview, the sergeant asked Suarez, "[D]o you have anything you want to get off your chest?" Suarez then "leaned forward, put his face into his hands, and *** said, yes." He then confessed to the robbery and implicated Castro (who also worked for the dealership), Harris, and an individual nicknamed "Shorty C." According to Sergeant Wodnicki eight hours after Suarez confessed, he made the statement again to Detective Luis Carrizal[3] and an assistant state's attorney.

¶ 14    Sergeant Wodnicki testified that he had Officers Tamlo and Rezny pick up Castro and arrest Harris. On August 24, 2013, at about 6:05 p.m., the sergeant Mirandized Castro, who "immediate[ly]" confessed to his involvement in the armed robbery. According to the sergeant, Harris arrived at the police station at 9 p.m. After being Mirandized, Harris denied having anything

---

[3] Throughout the record, Detective Carrizal's name is interchangeably spelled as "Carrizal" and "Carrazal." The record shows, however, that his name is correctly spelled as "Carrizal," and the parties do not dispute that both spellings refer to the same person.

to do with the robbery. On August 25, 2013, at 11 p.m., Azucena Ortiz, an employee of the Chevrolet dealership who witnessed the robbery, arrived at the police station and positively identified Harris from a lineup. At that point, Sergeant Wodnicki Mirandized Harris once again, and Harris confessed to the armed robbery.

¶ 15 On cross-examination, the sergeant admitted that he could write supplemental reports correcting any errors on arrest reports, including the apparent error stating Suarez was arrested at the dealership.

¶ 16 Assistant state's attorney Alexandra Molesky testified that on the night of August 23, 2013, she spoke with Ortiz, and Mirandized and interviewed codefendant Charles LeBlanc in Detective Carrizal's presence. Then, on August 24, 2013, at about 1:30 a.m., she Mirandized and interviewed Suarez. Suarez gave a statement regarding the events of the dealership robbery; ASA Molesky typed and reviewed the statement with Suarez. She, Detective Carrizal and Suarez signed every page of the statement. ASA Molesky also spoke with Detective Carrizal, who stated that no one "made *** any threats or promises" to Suarez, that Suarez had been "treated *** well," that Suarez received pizza and drinks, that he was able to use the bathroom when necessary, and never asked to make a phone call or consult an attorney.

¶ 17 On August 24, 2013, at about 9:32 p.m., ASA Molesky also Mirandized and prepared a typewritten statement with codefendant Castro using a similar procedure. On August 26, 2013, at 1:20 a.m., she Mirandized and interviewed Harris again in Detective Carrizal's presence, and prepared a statement with Harris.

¶ 18    After the State rested, defense counsel informed the trial court that another witness, Benjamin Zamudio,[4] was not present. Defense counsel asked the court to continue the matter after Suarez's testimony to "get Mr. [Zamudio] *** to come in." The court granted the request.

¶ 19    Suarez testified that prior to August 23, 2013, he had worked at the Chevrolet dealership for about two months. On August 23, a supervisor from the dealership named Jeff called Suarez and told him to come pick up his final check. Suarez went into the dealership to find Jeff, spoke to "a couple of the workers," and then waited until he was called into Helmstetter's office. Helmstetter told Suarez to sit down and "wait a couple minutes." At this point, Suarez "didn't know what was going on." After two or three minutes, three detectives with visible firearms, vests, and badges "showed up." The officers showed Suarez a photograph of a man and asked if Suarez knew him. Suarez "said no." Then, the officers told Suarez to put his hands behind his back because they were going to take him to the police station, and then handcuffed him. The officers also patted Suarez down and took his cell phone, wallet, and a knife that was in his pocket. Two of the officers took Suarez out of the office, while a third officer remained in the office and spoke to Helmstetter. Suarez stated that as he walked out of Helmstetter's office in handcuffs, he "held eye contact" with Zamudio, who was waxing vehicles.

¶ 20    Suarez testified that at the police station, he was placed in a white room with no windows or clocks. The officers removed the handcuff from his right hand and cuffed his left hand to the wall. After Suarez waited in the room for about two or three hours, a detective from the dealership and Sergeant Wodnicki entered the room. The detectives told Suarez they "ha[d] proof" and text messages showing Suarez was involved in the armed robbery, and asked him to identify the others

---

[4] While Zamudio's name is spelled as "Zamudo" throughout the record, Zamudio's testimony shows that his name is spelled "Zamudio." The parties do not dispute that the names Zamudo and Zamudio refer to the same person.

involved. Suarez denied that the detectives Mirandized him. He also stated that he asked the detectives for a phone call and a lawyer. However, the detectives told him that an attorney was a "waste of money," and that if he "help[ed]" himself, he would be able to "get out of there that night."

¶ 21    The detectives walked out, and two hours later, Detective Carrizal entered and asked Suarez about the incident. Suarez asked for a phone call, and the detective said, "hang on," and left. About two hours later, Detective Carrizal and ASA Molesky entered and asked Suarez about the incident. Suarez did not answer their questions and again asked for a phone call. Detective Carrizal and ASA Molesky left and returned two or three hours later. Suarez again asked for a phone call, but they told him to "hang on" once again. One of the "arresting detectives" came back with soda. After about 30 minutes, Detective Carrizal and ASA Molesky returned and asked Suarez questions, and Molesky "started writing stuff down." Suarez stated that at that point, he was tired and hungry and "started talking." Suarez stated that he had been told he "was free to go as long as [he] *** told them what was going on and [who] was involved." Suarez also stated that when he signed the statement, he did not use his typical signature because he "wanted to see maybe if that would help [him] out, because [he] wasn't involved." The defense entered into evidence an example of how Suarez normally signs his name, and Suarez testified that "[t]he J is different, the way I do the M, and the S in my last name."

¶ 22    On cross-examination, Suarez clarified that two of the three people who picked him up from the dealership were not "detectives," but "regular officers." Suarez also stated that when he asked ASA Molesky for an attorney, she told Suarez "the statement was already typed up." He also denied telling ASA Molesky about his involvement in the robbery. Further, Suarez stated that he was not present when the ASA typed the statement, that she never read the statement to him,

and that she only told him to "look at it and sign." Suarez also confirmed that he was given food and drinks, and that the police never threatened him. On redirect examination, Suarez stated he was in the police station for about 12 hours by the time ASA Molesky spoke to him.

¶ 23    In rebuttal, the State called two witnesses: (1) Officer Rezny, who largely corroborated the testimony of his partner, Officer Tamlo; and (2) Detective Carrizal, who testified consistently to ASA Molesky regarding Suarez's statement.

¶ 24    On December 8, 2015, the trial court denied Suarez's motions and found that Suarez "voluntarily went" to the police station and that Suarez knowingly and voluntarily waived his *Miranda* rights, leading to his statement to the police and subsequent arrest.

¶ 25    In May 2016, Suarez moved to reopen the hearing on his motion to suppress to present the testimony of Zamudio. Suarez alleged that his counsel had personally delivered subpoenas to an address where Zamudio's sister said Zamudio still resided. After the trial court denied Suarez's motion to suppress, however, defense counsel learned that Zamudio had been "temporarily living out of state." Zamudio had since returned to his Chicago residence and was available to testify.

¶ 26    The record reflects that the trial judge who had denied Suarez's motion to suppress retired, and the case was transferred to a new judge. The new judge granted Suarez's motion, and on July 25, 2016, a hearing was conducted as to Zamudio's testimony.

¶ 27    Zamudio testified that on August 23, 2013, at about 4:20 p.m., he was shining vehicles on the showroom floor at the Chevrolet dealership. At that time, Zamudio had known Suarez for about two years, Suarez was a "friend from the neighborhood," and Zamudio and Suarez "got together on the weekends and hung out." From about 15 to 20 feet, Zamudio saw Suarez enter the dealership owner's office but could not see inside the office. After "a couple of minutes," two detectives in

"plain blue clothes" with firearms and handcuffs walked Suarez out of the office with his hands cuffed behind his back. They entered the "repair area" out of Zamudio's sight.

¶ 28    On cross-examination, Zamudio stated that Suarez was supposed to work a full shift that day, and that Suarez showed up just before 3 p.m. Zamudio also stated that Suarez did not look concerned as he exited the owner's office. Additionally, Zamudio confirmed that he did not "want to see anything bad happen to [his] friend, Johnathan."

¶ 29    The court asked how the defense wished to proceed and whether the defense was "asking to call any further witnesses." Suarez's counsel acknowledged that the additional hearing was limited to Zamudio's testimony but stated that he "would ask to call the owner" of the dealership "because he's the only other witness that saw what happened at this time." The court asked why the owner was not called a year ago, to which defense counsel responded: "[T]here's no reason he couldn't have been called before. I agree with that." Counsel then added that the owner would have testified that he called the police district and told them Suarez was coming, and that Suarez never received his check. According to defense counsel, this was "an important piece of the evidence," indicating that Suarez was arrested at the dealership and did not leave voluntarily. The court denied the request to call the owner, stating the defense had "ample opportunity" to present him and chose not to do so.

¶ 30    The court reiterated the previous judge's prior ruling and found that it did not believe Zamudio's testimony. The court also stated that there was no explanation as to why Zamudio was absent, and that such absence "speaks to somebody looking to hold an ace up his sleeve."

¶ 31    Suarez's jury trial began on October 25, 2016. During opening statements, the State remarked that Suarez "got his buddy, his coworker, Sergio Castro, and they concocted a plan and that plan consisted of another employee of the [dealership], Charles LeBlanc, and two other

buddies of theirs who didn't work there." The State commented, "So all in total there were five accomplices to carry out the inside job that [Suarez] masterminded." The defense did not object to these remarks, but rather commented in opening statements that the evidence would not show Suarez "was in on" the robbery that occurred.

¶ 32    The State called Ortiz, who testified that on July 16, 2013, she worked an evening shift as a cashier at the Chevrolet dealership. Ortiz stayed late because she "had made a couple mistakes" and was waiting for a manager to tell her she could leave. She was alone at the dealership with three "porters," who "were responsible for washing vehicles, putting gas in the vehicles and running errands for the dealership." These porters were Suarez, Castro, and LeBlanc. Just prior to 11 p.m., Ortiz was counting money when Suarez approached her window and told her not to leave because Castro needed to return a receipt documenting money spent on an errand.

¶ 33    At about 11 p.m., Ortiz looked up and saw a man hold Castro at gunpoint and state, "open up or I'll shoot." She did not see Suarez. Ortiz pressed a button that opened her office door, and another man walked in and asked for money. Ortiz stated the man with the firearm and the man who entered her office had their faces covered, but she could still see their eyes. Ortiz gave the second man the money she had "with [her]" and money from the cash box. Then, the second man asked for "the rest of the money," and Ortiz stated there was more in her office's safe, which was like a "walk in closet." The second man grabbed Ortiz's hair, and Ortiz led him to the safe. Ortiz gave the second man money from two more cash boxes and the safe. The man grabbed the money, "knocked *** over" items on Ortiz's desk, forced Ortiz inside the safe, and closed the safe door. Ortiz sat down in the safe, heard a "loud noise" like a gunshot, opened the safe, and called her husband. After the robbery, Castro asked Ortiz, "did they take a lot of money," which Ortiz found "curious."

¶ 34    On August 25, 2013, Ortiz went to the police station, viewed a lineup, and identified the man who entered her office and took the money. On October 11, 2013, she returned to the station and identified the man who had the firearm from another lineup. The State published to the jury video footage of the robbery, as well as photographs of the Chevrolet dealership and Ortiz's office.

¶ 35    On cross-examination, Ortiz confirmed that in the surveillance video of the robbery, Suarez was on his knees with his hands on his head. Ortiz also confirmed that when the robbery occurred, she did not see Suarez do or say "anything that would indicate he was trying to communicate with" the man with the firearm or the man who took the money.

¶ 36    Helmstetter, an owner of the Chevrolet dealership, testified that based on surveillance footage, the two men who entered the Chevrolet dealership would have had to enter through a door that the general public could not access at that time. Rather, someone would have had to open the door from the inside or copy a key. On August 23, 2013, around noon or 1 p.m., Helmstetter arrived at the dealership, contacted the police department, and then met with Suarez. The police officers arrived about 20 to 30 minutes later and Suarez left with them. Helmstetter could not recall whether he gave Suarez his final paycheck.

¶ 37    On cross-examination from Castro's counsel, Helmstetter testified that Pierre Campbell was the manager on duty the evening of the robbery, and that Campbell left the dealership "moments" before the robbery occurred. Helmstetter stated that he knew this from speaking to Campbell. Helmstetter also had keys to all the doors at the dealership and access to the keypad at the back of the dealership because he was the "locking manager." Suarez's counsel did not adopt this testimony elicited from Castro's counsel.

¶ 38    On cross-examination from Suarez's counsel, Helmstetter stated he did not have Suarez's final paycheck on his desk when Suarez arrived, and he was "not certain" that Suarez came to the

dealership to pick up the paycheck. Helmstetter also could not recall whether he called the police before or after Suarez's arrival. Additionally, Helmstetter did not remember whether the police officers entered the office before or after Suarez, or how many police officers entered his office. He could not remember discussing the check with Suarez or handing the check to Suarez. Helmstetter stated Suarez was in his office for "15, 10, 20 minutes, 30 minutes," and he remembered Suarez "sitting in front of [him]" because "[i]t was obviously uncomfortable." Helmstetter further could not remember the "first thing" the police did, but he "remember[ed] them asking if Johnathan would answer some questions and talk to them." Additionally, he did not recall whether he was present when the police left with Suarez, and he could not recall whether the police handcuffed Suarez. At one point, Helmstetter stated he did not "even remember if [Suarez] was in [his] office." Helmstetter also stated he called the police because he "wanted the [robbery] investigated." He was not certain if he had met Sergeant Wodnicki prior to August 23, 2013, and he was "not even certain" he knew who the sergeant was.

¶ 39    Outside the jury's presence, Castro's counsel moved for mistrial and asserted that the State improperly admitted hearsay when Ortiz testified that Castro asked her whether "a lot of money" was stolen. According to Castro's counsel, the State failed to tender this statement in discovery. The trial court took the motion under advisement. The court later denied Castro's motion outside the jury's presence, finding that the statement was not made in bad faith because the State "believed the statement had been present in a General Progress Report or in a case report." The court also noted that the statement was "somewhat ambiguous," and that it did not "absolutely establish***" what the State wished to argue. Thus, the trial court found that the hearsay statement was not prejudicial and did not warrant a mistrial. Nonetheless, the trial court instructed the jury for Castro's trial to disregard the statement that Castro purportedly made to Ortiz.

¶ 40    Chicago police detective Erik Chopp next testified that on July 16, 2013, he went to the Chevrolet dealership to investigate the robbery. Detective Chopp learned that two men entered the dealership, one of which was armed. The two men took one employee down a hallway into a waiting room and forced another employee onto his knees at gunpoint. After they took $4,000 from Ortiz's office, they fled. On their way out of the dealership, one of the offenders fired a revolver, and the bullet hit a coffee machine and landed on the floor. Ortiz, Suarez, Castro, and LeBlanc were at the scene, and their description of the offenders was "vague," as "[t]hey said they wore masks." At about 3 a.m., Detective Chopp learned that a man named Johnny Coleman had been arrested with a revolver "a few blocks" from the dealership. The revolver was inventoried.

¶ 41    On cross-examination, Detective Chopp confirmed that on the night of the offense, he recovered Suarez's phone, which one of the offenders had taken and dropped in a hallway. The detective also confirmed that after reviewing the video footage and speaking with everyone present, he had no information indicating that Suarez was involved in the robbery.

¶ 42    Chicago police officer Karl Richardt next testified that at July 17, 2013, at about 2:30 a.m., he and Officer Flagg[5] drove southbound in a marked police vehicle and saw Coleman riding a bicycle northbound at the 6600 block of South Western. They drove towards Coleman, who increased his speed, repeated, "no, no, no," and crashed his bicycle. Officer Flagg chased Coleman on foot, and Officer Richardt followed the chase in his vehicle. Officer Richardt saw Coleman remove a revolver from his waistband and throw the firearm onto the roof of a building. The firearm was recovered and contained one live round and one expended shell cartridge. Officer Richardt also recovered over $500 from Coleman's person. The firearm was entered into evidence.

---

[5] The first name of Officer Flagg was not provided in the transcript of the testimony at trial.

¶ 43    Chicago police evidence technician William Jackson testified that on July 16, 2013, he took photographs of the scene. He also recovered and inventoried a bullet from the floor of the Chevrolet dealership's waiting room. Illinois state police forensic scientist Kellen Hunter testified that the inventoried bullet recovered from the dealership was fired from the revolver that Coleman threw on top of the building.

¶ 44    Sergeant Wodnicki next testified that prior to August 23, 2013, he had not assisted the investigation of the robbery at the Chevrolet dealership. On August 23, he received a call from the Chevrolet dealership stating that one of the employees who was present during the robbery, Suarez, would be at the dealership to pick up his termination paycheck. The detective assigned to the case was on furlough, so Detective Wodnicki reviewed the case and had Officers Tamlo and Rezny go to the dealership "to see if we could get Mr. Suarez to come in for another interview." The two officers "brought [Suarez] back" to the police station, and at about 4:20 p.m., upon which Sergeant Wodnicki Mirandized and interviewed him.

¶ 45    Suarez told Sergeant Wodnicki he "was happy" he was asked to come in because "he had heard back at the dealership that people thought he was involved in the robbery," and he "wanted to get his side of the story out." Suarez stated he "had nothing to do with the robbery," and was working with Ortiz and two porters, Castro and LeBlanc, at the time of the incident. During this interview, Suarez "was sweating profusely" even though the room was at "standard room temperature," he "kept shifting," his hands were "very tense," and his fingers were "fidgeting." Sergeant Wodnicki testified that he then asked Suarez, "[I]s there something you want to tell me? Is there something you want to get off your chest?" Suarez denied that he did the robbery and stated he did not have the firearm and did not shoot anybody, and "[n]obody got shot" or "hurt." The sergeant then asked, "[H]ey, is there something you want to get off your chest? Just tell the

truth." Suarez put his hands on his head, covered his face, and told Wodnicki, "You're right. I did the stain." Sergeant Wodnicki explained that "stain" is a "street term" meaning "robbery."

¶ 46    According to Sergeant Wodnicki, Suarez then told him that before work on the day of the incident, Suarez met with Harris, and they decided to rob the dealership that night. Later, Castro left the dealership to "pick up ice," but instead picked up Harris and Coleman, who was nicknamed Shorty C, and brought them back to the dealership. Harris and Coleman hid in the dealership's parking lot, and LeBlanc opened the door for them to enter the dealership and ensured the door was open so they could later flee. Suarez stood at the cashier counter and distracted Ortiz from placing the dealership's money in the safe so that Harris and Coleman could access it. Then, Harris, Coleman, and Castro entered the room, Harris and Coleman "announced a robbery," and Castro pretended to be a hostage. Coleman pointed a firearm at Ortiz. Then, Harris went behind the counter, smashed Ortiz's phone, and took money from the cashier and safe. As Harris and Coleman left the dealership, Coleman "fire[d] a round," and they ran "out the back." Sergeant Wodnicki then testified, "Thank God Susie [Ortiz] wasn't shot." After the incident, Suarez told the sergeant that Suarez inaccurately described the offenders' clothing to police to "throw [them] off," and Suarez later met with Harris to obtain the robbery's proceeds.

¶ 47    On cross-examination, the sergeant confirmed that the recovered firearm that Coleman threw was processed, but neither Coleman nor the firearm were suspected of being linked to the robbery. The sergeant also could not confirm whether he personally suspected Coleman of being involved in the robbery because he "had nothing to do with" the case until he "got involved working in the area that day." He did not recall when he first spoke to Helmstetter but confirmed that he "might have talked to" Helmstetter before August 23, 2013. Suarez's counsel then presented previous testimony that Sergeant Wodnicki gave during the hearing on Suarez's motion

to suppress, in which Wodnicki testified that he met with Helmstetter before the phone call on August 23, 2013.

¶ 48     On cross-examination, Sergeant Wodnicki also confirmed that the robbery occurred in the 8th District, which was about 10 miles away from the 18th District police station, where Officers Tamlo and Rezny took Suarez. The sergeant also acknowledged that at the time Suarez was at the police station, he hoped that Suarez would give him a statement because he was suspicious of Suarez.  Nonetheless, Sergeant Wodnicki confirmed that he was "absolutely devoid of evidence" that Suarez was involved in the robbery before Suarez gave his statement. He also denied having reviewed any video footage from the dealership and stated that he was unaware of such footage. The interview with Suarez was also not recorded.

¶ 49     Additionally, the sergeant admitted that he spoke with Suarez on August 23, 2013, at 5:15 p.m., but that his report of the case reflected the date as April 21, 2014. Sergeant Wodnicki stated that he could not recall whether the report was made when Suarez gave his statement or a year later. On redirect examination, Wodnicki stated that the investigation stayed open until a "fourth suspect" was arrested and confessed, and it was routine to complete final reports once the investigation is completed.

¶ 50     ASA Molesky testified that on August 23, 2013, at about 8:41 p.m., she met with Sergeant Wodnicki and Detective Carrizal at the police station, interviewed Ortiz, and then Mirandized and interviewed Suarez for about an hour. She could not recall if Suarez was initially handcuffed. Asa Molesky stated that at 2:43 a.m., Suarez began to give her a statement, which she typed and had Suarez review and sign. ASA Molesky then read the statement to the jury.  This statement largely corroborated Sergeant Wodnicki's testimony regarding Suarez's statement.

¶ 51    The statement further added that after Castro brought Harris and Coleman to the dealership, Suarez met with Castro, Harris, and Coleman in an alley behind the dealership and agreed to rob the dealership that night. Suarez then told LeBlanc about the plan, and LeBlanc agreed to unlock the gate leading to the side lot where Harris and Coleman would wait. The statement further added that while Suarez was at Ortiz's window, he texted Coleman that it was "fine" to begin the robbery. Harris, Coleman, and Castro entered; Suarez laid face down on the ground; and Harris grabbed Suarez's cell phone, which "was not part of the plan." After Harris and Coleman left, Suarez saw Ortiz's cell phone lying on the ground in "several pieces with the battery out," put it back together, and used it to call the police.

¶ 52    On cross-examination, ASA Molesky acknowledged that before interviewing Suarez, she spoke with Detective Carrizal and Sergeant Wodnicki. She acknowledged that she reviewed surveillance video footage with the detective and "believe[d]" Sergeant Wodnicki was present but could not be sure he watched the video.

¶ 53    After the State rested, the defendant chose not to testify and presented no witness testimony or evidence in his own defense. Instead, the parties proceeded with closing arguments.

¶ 54    In closing, the State asserted that Suarez was legally responsible for the actions of the other offenders because he was on a "team," and "[e]ach person on the team, no matter how big or small their role, is responsible for the actions of every person on that team." After outlining the purported events of the incident as they related to the elements of Suarez's charges, the State asked the jury, "[I]s the defendant part of the team? Is the defendant legally responsible? *** He is the mastermind behind the whole team."

¶ 55    Defense counsel argued there was no evidence that Suarez committed the crime. Counsel also noted that Helmstetter denied knowing Sergeant Wodnicki prior to August 23, 2013, even

though both of them had previously testified that they knew each other before August 23. According to defense counsel, there was a "prior relationship" between Helmstetter and the sergeant, and Helmstetter had called Wodnicki because he "wanted something done," even though Detective Chopp was assigned to the case. Defense counsel also questioned why Sergeant Wodnicki denied having seen the surveillance video when ASA Molesky stated that she was with him when she saw it. Additionally, counsel questioned why Suarez gave his statement to ASA Molesky so many hours later and stated that Sergeant Wodnicki was prepping Suarez to give a false statement.

¶ 56    After deliberations, the jury found Suarez guilty of one count of armed robbery and two counts of aggravated kidnaping. On November 14, 2016, Suarez filed a motion for judgment notwithstanding the verdict or for new trial, alleging that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred in denying his motion to suppress; (3) the State elicited hearsay testimony from Ortiz "attributable to the [d]efendant as admissions of guilt;" and (4) the trial court erred in denying Castro's motion for mistrial.

¶ 57    Suarez subsequently moved to substitute counsel, and the substituting counsel filed a motion for a new hearing on his motion to suppress and for a new trial, based on the discovery of a new witness, Campbell, who was an employee present at the Chevrolet dealership when Suarez was arrested. The motion also alleged that the State failed to prove him guilty beyond a reasonable doubt, where the only evidence establishing his guilt was Suarez's confession.

¶ 58    At a hearing on May 8, 2017, the defense called Campbell, who testified that he worked as the sales manager at the Chevrolet dealership in July and August 2013, and that the owner's office was visible and 50 to 75 feet from Campbell's office. Campbell saw Suarez arrive, enter the showroom, speak to the manager, and then enter the owner's office. After about an hour, two

"Crown Vic[s]" pulled up at the front and back of the dealership respectively. Then, two "officers or detectives" in plain clothes entered the owner's office, but Campbell could not see inside. After about another 30 minutes to an hour, the "officers or detectives" exited with Suarez, who was handcuffed behind his back, and walked him through the service room to the vehicle in front of the dealership.

¶ 59    Campbell also testified that he initially met with Suarez's trial counsel, Pablo DeCastro, on August 21, 2016. Campbell and DeCastro later had a conversation "on September 14th or September 29th," in which Campbell mentioned his employment at the Chevrolet dealership, and DeCastro asked if Campbell knew about the robbery.

¶ 60    On cross-examination, Campbell stated his duties as a sales manager were to manage the sales employees and porters, "handle any relations in the service department," and "submit applications for financing." Campbell acknowledged he did not work the entire day of the armed robbery.  However, Campbell explained that just before the robbery, he was driving a friend who lived near the dealership and entered the dealership as it was locking up to use the restroom. Campbell agreed to give a porter named "Jonathan Vial"[6] a ride home. As he drove "Vial" to his house, a manager named Jeff Kissell called him and said, "[T]he store is getting robbed, I need you to go back to the store." Campbell immediately returned to the dealership, where the police officers who were present asked him why he was there.  Campbell told the officers he was the sales manager, and that he was called back to the dealership due to the robbery. Kissell and Helmstetter were on their way to the dealership, and the police officers asked Campbell to stay until one of them arrived. The "detectives or police officers" asked Helmstetter whether he thought

---

[6] The record indicates that "Jonathan Vial" is a phonetic spelling of the porter's name. Vial's name does not appear elsewhere in the record.

Campbell was involved in the robbery, and Helmstetter told them, "[N]o, Pierre's worked with me for 12 years." The day after the robbery, Campbell learned that employees at the dealership were suspected of the armed robbery.

¶ 61 Additionally, Campbell admitted that by the time Suarez came to pick up his check on August 23, 2013, he thought Suarez was a suspect. Campbell confirmed there were surveillance cameras at the dealership but could not confirm whether Suarez would be visible in any footage from August 23rd because it "[d]epends on the angle" of the camera.

¶ 62 On redirect examination, Campbell further confirmed that he "happened to pick" DeCastro to advise him in an unrelated matter. Campbell stated he did not initially know that DeCastro was involved in the dealership robbery case. On further questioning from the court, Campbell clarified that he discovered DeCastro's legal services through Google. Campbell also stated that in August 2016, he met with DeCastro in person for the first time, and in September 2016, DeCastro asked him about his employment history. Campbell mentioned the Chevrolet dealership, and DeCastro asked him if he was present when the dealership was robbed. At that point, Campbell mentioned that he saw the police lead Suarez out of the dealership in August 2013.

¶ 63 The trial court denied Campbell's posttrial motion and found that "if Mr. Campbell is to be believed," DeCastro knew of Campbell's testimony prior to trial, and so it was not newly discovered evidence. The court concluded that either Campbell did not actually tell DeCastro about his employment prior to trial, or DeCastro made a "tactical decision" that was in Suarez's best interest. Nonetheless, the court stated it was "not certain that Mr. Campbell was telling the truth." The court found it "curious" that Campbell would note Suarez's "custodial status," but not have "a whole lot of other insight" into the circumstances of the robbery.

¶ 64    On May 23, 2017, Suarez filed a supplemental motion for new trial, alleging that Campbell spoke to Suarez's trial counsel in July 2016 and provided information to his counsel regarding Suarez's arrest in September 2016. Suarez further alleged that his trial counsel represented both Suarez and Campbell as of September 2016. As a result, Suarez claimed that a *per se* or actual conflict of interest existed, and he was entitled to a new trial.

¶ 65    On May 28, 2017, Suarez filed a supplement to the motion, which contained the affidavit of Campbell. This affidavit alleged that on August 23, 2013, Campbell saw Suarez enter the manager's office at the dealership and leave with "several police officers" and with his hands cuffed behind his back. The police led Suarez to a police vehicle and placed Suarez in the backseat.

¶ 66    At a hearing on the motion on July 7, 2017, Suarez called trial counsel Pablo DeCastro, who testified that he was not aware of an individual named Campbell in Suarez's case until during Suarez's trial.  Specifically, DeCastro testified that at trial he heard his co-counsel ask Suarez "whether there were any other witnesses or employees of the dealership that might have been present when he was arrested," to which Suarez responded that Campbell, who was a coworker at the dealership, was present. According to DeCastro, Campbell's name "did ring a bell," because he had recently been appointed to represent someone named Pierre Campbell in a "Federal investigation."  DeCastro testified that he met Campbell on September 14, 15, and 29, 2016. He further averred that "had not made the connection" that Campbell could be a witness in Suarez's case because DeCastro was representing Campbell in matters that were related to neither the dealership nor Suarez. DeCastro admitted, however, that before trial he reviewed the progress reports from the Chicago Police Department, which contained Campbell's contact information, but that he did not attempt to contact Campbell at that time. DeCastro also acknowledged that he

did not call Helmstetter as a witness during the motion to suppress, even though Suarez had told him that the police arrested him in Helmstetter's office.

¶ 67    On cross-examination, DeCastro denied discussing the Chevrolet dealership with Campbell during their meetings in September 2016. He also confirmed he did not know that Campbell had worked at the Chevrolet dealership until during Suarez's trial. Prior to trial, DeCastro had only seen Campbell's name mentioned in one report during discovery, but it indicated that Campbell was not present during the robbery, and it was not clear whether Campbell was present when Suarez left the dealership with the police. DeCastro also stated he did not know if the Pierre Campbell at the dealership was the same Pierre Campbell he was working with on the federal case. The trial court briefly examined DeCastro and clarified that Campbell's information only came up in a general progress report dated July 16, 2013, the date that the robbery occurred and over a month before Suarez's eventual arrest.

¶ 68    In argument, Suarez's new counsel argued that DeCastro provided ineffective assistance by failing to call Helmstetter or Campbell for the hearing on Suarez's motion to suppress. Counsel acknowledged that the court did not find Zamudio credible but asserted that it may have found his testimony credible alongside the testimony of Helmstetter and Campbell. Counsel thus stated that the court should conduct a new full hearing on the motion to suppress with the testimony of Zamudio, Helmstetter, and Campbell.

¶ 69    The State responded that Campbell's name only appeared in the progress report because Campbell was the manager on duty earlier on the day of the robbery, which "ha[d] nothing to do with the motion to suppress." Further, the arrest report did not mention Campbell, and Suarez did not mention Campbell to his counsel until trial commenced. According to the State, if DeCastro had known another possible witness existed, he would have added that witness when the hearing

was reopened for Zamudio. Moreover, the State added that Campbell "was confused, because he gave a different timeline than Mr. DeCastro" and said he told DeCastro about his dealership employment in September 2016.

¶ 70    The trial court denied Suarez's motion. The court found that DeCastro's assistance was not "deficient" because Suarez had not disclosed Campbell as a potential witness until during trial, and because the progress report containing Campbell's name did not show Campbell was at the dealership on August 23, 2013. The trial court further held there was no prejudice because it did not find Campbell's testimony credible. The court observed that a prior judge had ruled on the initial hearing on Suarez's motion to suppress and found the State's witnesses were credible, and the court was "not to make different credibility determinations" from those made by the prior judge.

¶ 71    The trial court merged Suarez's two aggravated kidnaping counts and sentenced Suarez to concurrent prison terms of 22 years for armed robbery and 10 years for aggravated kidnaping. This appeal follows.

¶ 72                                   ANALYSIS

¶ 73    All of Suarez's claims on appeal are rooted in the assertion that he received ineffective assistance from his trial counsel. "The sixth amendment guarantees a criminal defendant the right to effective assistance of trial counsel at all critical stages of the criminal proceedings." *People v. Brown*, 2017 IL 121681, ¶ 25; see U.S. Const., amend. VI. To succeed on an ineffective assistance claim, a defendant must show that (1) "counsel's performance fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Dupree*, 2018 IL 122307, ¶ 44 (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). To establish the first prong,

a defendant "must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy," as "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Manning*, 241 Ill. 2d 319, 327 (2011). To establish the second prong, a defendant must show "actual prejudice," and not mere speculation that the defendant may have been prejudiced. *People v. Patterson*, 2014 IL 115102, ¶ 81. "A 'reasonable probability,' " for purposes of the second prong, is defined as " 'a probability sufficient to undermine confidence in the outcome.' " *People v. Simpson*, 2015 IL 116512, ¶ 35 (quoting *Strickland*, 466 U.S. at 694).

¶ 74                    A. Conflict of Interest and Failure to Investigate

¶ 75    Suarez first claims his trial counsel, DeCastro, provided ineffective assistance by simultaneously representing Suarez and Campbell and therefore operating under a *per se* conflict of interest. Suarez acknowledges the circumstances that typically give rise to a *per se* conflict of interest do not exist here but asserts we may find a *per se* conflict due to the "compelling" facts of this case. Suarez also asserts an actual conflict of interest existed because DeCastro's representation of Campbell resulted in specific defects in Suarez's performance. Specifically, at trial, counsel for Castro elicited testimony from Helmstetter that (1) Campbell was the "locking manager" on duty on the night of the robbery, (2) Campbell had keys to all the dealership's doors and access to the key pad, and (3) Campbell left the dealership "moments" before the robbery. However, DeCastro did not adopt this testimony into Suarez's case, and Suarez claims DeCastro did not examine it further. According to Suarez, DeCastro failed to do so because it would implicate his client, Campbell, as being partially responsible for the robbery.

¶ 76    In the alternative, Suarez claims that for these same reasons, DeCastro failed to adequately investigate his case. Specifically, he contends that DeCastro, among other things: (1) made "no

effort to contact Campbell or Helmstetter" prior to the hearing on his motion to suppress or the trial, (2) failed to request a continuance of the jury trial when he learned of additional "potential witnesses," and (3) failed to interview Jeff Kissell, whom Campbell claimed was the manager on the night of the robbery and who "could have been" the manager whom Suarez spoke to before he was purportedly arrested at the dealership.

¶ 77     In response, the State asserts that no *per se* conflict of interest existed because Campbell was not a critical witness, as Campbell's testimony was neither credible nor consistent with other witnesses' testimony. The State also asserts that there is no evidence showing that Campbell was responsible for, or involved in, the robbery. Thus, according to the State, we cannot conclude that Campbell would benefit from an unfavorable verdict for Suarez, or that Campbell and Suarez had conflicting interests.

¶ 78     The sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. *People v. Morales*, 209 Ill. 2d 340, 345 (2004). "Such representation means assistance by an attorney whose loyalty to his or her client is not diluted by conflicting interests or inconsistent obligations." *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). There are two types of conflicts of interest: *per se* and actual. *Id.*

¶ 79     "A *per se* conflict is one in which facts about a defense attorney's status *** engender, *by themselves*, a disabling conflict." (Emphasis in original and internal quotation marks omitted.) *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). "When a defendant's attorney has a tie to a person or entity that would benefit from an unfavorable verdict for the defendant, a *per se* conflict arises." *Id.* The Illinois Supreme Court has recognized three circumstances where a *per se* conflict of interest exists:

"(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved in the prosecution of defendant."

*Taylor*, 237 Ill. 2d at 374.

Where a *per se* conflict of interest is established, "there is no need to show that the attorney's actual performance was in any way affected by the existence of the conflict." *People v. Spreitzer*, 123 Ill. 2d 1, 15 (1988). Whether the undisputed facts of record present a *per se* conflict of interest is a question we review *de novo*. *Morales*, 209 Ill. 2d at 345.

¶ 80     To establish an actual conflict of interest, a defendant must show the conflict adversely affected counsel's performance. *People v. Peterson*, 2017 IL 120331, ¶ 105. To do so, the defendant must demonstrate that (1) " 'some plausible alternative defense strategy or tactic might have been pursued,' " and (2) " 'the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " *People v. Nelson*, 2017 IL 120198, ¶ 37 (quoting *United States v. Fahey*, 769 F. 2d 829, 836 (1985)). The defendant need not show that the alternative defense would have been successful if used, but rather must only show that the strategy or tactic " 'possessed sufficient substance to be a viable alternative.' " *Id.* (quoting *Fahey*, 769 F. 2d at 836). The defendant "must point to some specific defect in his counsel's strategy, tactics, or decisionmaking attributable to the alleged conflict of interest." *People v. Austin M.*, 2012 IL 111194, ¶ 82. "Mere [s]peculative allegations and conclusory statements are not sufficient to establish that an actual conflict of interest affected counsel's performance." (Internal quotation marks omitted.) *Hernandez*, 231 Ill. 2d at 144.

¶ 81    Generally, claims of ineffective assistance of counsel should be reviewed on direct appeal unless "the record is incomplete or inadequate for resolving the claim." *People v. Veach*, 2017 IL 120649, ¶ 46.  The rationale is that if defendants do not raise such claims on direct review where the claims are apparent on the record, they risk forfeiture of the argument.  *Id*.  However, our supreme court has made clear that where the record is incomplete or inadequate such that review of the issue depends on facts not found in the record, ineffective assistance of counsel claims are better suited for review under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq. (*West 2016)). *Id*., ¶ 46.

¶ 82    In the present case, we find that Suarez's ineffective assistance of counsel claim based on a conflict of interest is rooted in factual assertions not adequately developed in the record, and therefore it is better suited for a postconviction claim. *People v. Veach*, 2017 IL 120649, ¶ 46 (observing that "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim"); see 725 ILCS 5/122-1, *et seq.* (West 2018)).

¶ 83    Specifically, the trial proceedings minimally described Campbell's involvement at the dealership both on the night of the robbery, and on the day that Suarez left the dealership for the police station. In addition, while at trial Helmstetter testified that Campbell served as the "locking manager" on the night of the robbery, Campbell later denied being on duty at the dealership at all on that date.  Moreover, Campbell was not called to testify until after the motion to suppress and trial had already taken place, and the record reflects little inquiry into the role he played during the relevant dates. There is also little testimony or evidence regarding the role played by Jeff Kissell, whom Campbell claimed was the actual manager on duty on the night of the robbery.  Kissell himself was never called as a witness at trial.

¶ 84    The record is also inadequate to show that Suarez's counsel did not inquire into Campbell's involvement or culpability due to his representation of Campbell.  Campbell stated that he discussed his employment at the Chevrolet dealership with DeCastro before Suarez's trial. On the other hand, DeCastro testified he did not know of Campbell's involvement at the dealership until he overheard Suarez tell DeCastro's co-counsel that Campbell was present at the dealership when Suarez was taken to the police station. According to DeCastro's testimony, Suarez disclosed this information only after DeCastro's co-counsel asked, "whether there were any other witnesses or employees of the dealership that might have been present when he was arrested." There is no explanation in the record as to what prompted Suarez's counsel to ask this question *during* the course of trial, and DeCastro's co-counsel never testified at the hearing on Suarez's supplemental motion for a new trial, so as to provide us with any insight.  Furthermore, Suarez's substituted counsel presented no explanation as to how or when Suarez learned of Campbell's presence at the dealership. Due to these apparent gaps in the record, we can only guess as to when DeCastro first knew that his client, Pierre Campbell, was the same Pierre Campbell who worked at the Chevrolet dealership. By extension, we also cannot conclude whether or not DeCastro's simultaneous representation of Suarez and Campbell might have affected DeCastro's performance at Suarez's trial.

¶ 85    For these same reasons, we are also unable to conduct a meaningful review of Suarez's allegations that counsel was ineffective for failing to adequately investigate his case, by making no effort to contact Campbell or Helmstetter, and by failing to interview Jeff Kissell or to in the very least ask for a continuance when he learned of these "potential witnesses."  *Veach*, 2017 IL 120649, ¶ 46.  All of these assertions concern matters not contained in the record, as they revolve around trial counsel's actions and omissions outside of the court proceedings.  Accordingly, we

find that under the particular circumstances of this case, Suarez's ineffective assistance of counsel claims are better suited to postconviction proceedings, where Suarez can supplement the record with the necessary supporting evidence to substantiate and develop his claims. See *e.g.*, *People v. Williams*, 2019 IL App (3d) 160412, ¶¶ 34-37.

¶ 86    In coming to this decision, we note that were we to reach the merits of these two claims of ineffective assistance of counsel with the insufficient record before us, Suarez would be precluded from raising them in a postconviction petition despite any evidentiary support he may provide in his petition. See *People v. Coleman*, 168 Ill. 2d 509, 522 (1995) (issues decided on direct appeal are barred from being raised in subsequent proceedings by *res judicata*). Accordingly, we decline to address these issues, affirm the judgment of the circuit court as to them, and instead invite Suarez to raise them in a postconviction petition.

¶ 87                            B. Admission of Hearsay Statements

¶ 88    On appeal, Suarez next argues that his trial counsel was ineffective for failing to object to two hearsay statements elicited by the State, namely: (1) when Ortiz testified that after the robbery, Castro asked her whether the offenders took "a lot of money"; and (2) when Sergeant Wodnicki testified that the investigation remained open until a fourth suspect gave a confession. For the reasons that follow, we disagree.

¶ 89    Both the United States and Illinois Constitutions guarantee a criminal defendant the right to confront witnesses against him or her. *People v. Whitfield*, 2014 IL App (1st) 123135, ¶ 25; U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that "the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination." *People v. Patterson*, 217 Ill. 2d 407, 423 (2005) (citing

*Crawford*, 541 U.S. at 68). To resolve a claim under *Crawford*, this court must answer the following questions:

> "(1) Was the out-of-court statement hearsay because it was offered *** for the truth of the matters asserted therein? (2) If hearsay, was the statement admissible under an exception to the hearsay rule? (3) If admissible hearsay, was the statement testimonial in nature? and (4) If testimonial, was admission of the statement reversible error?" *People v. Leach*, 2012 IL 111534, ¶ 63; see also *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 147.

The rule against hearsay ordinarily prohibits "the introduction at trial of *** out-of-court statements that are offered to prove the truth of the matter asserted." *Peterson*, 2017 IL 120331, ¶ 17. However, out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not hearsay and do not implicate the confrontation clause. *People v. Peoples*, 377 Ill. App. 3d 978, 983 (2007).

¶ 90    In the present case, we need not determine whether either of the two alleged statements constituted hearsay since even assuming that they did, neither implicated Suarez in any way, so as to be prejudicial. This is particularly true, where during trial, Suarez presented no evidence or testimony in his own defense. For these reasons, we will not reverse the trial court's judgment based on trial counsel's failure to object to alleged inadmissible hearsay statements.

¶ 91                    C. Failure to Impeach Witnesses

¶ 92    Suarez next argues that trial counsel failed to impeach Sergeant Wodnicki with, among other things; (1) his prior testimony during the hearing on Suarez's motion to suppress; (2) the video surveillance footage; (3) Suarez's handwritten statement; and (4) Detective Chopp's testimony. The State responds that Suarez's counsel could only have impeached Sergeant

Wodnicki based on prior inconsistent statements. The State also asserts that Suarez cannot show he was prejudiced by the failure to impeach the sergeant, as the sergeant was not an "important witness," and the jury still had evidence to convict Suarez regardless of any impeachment. For the reasons that follow, we agree with the State.

¶ 93    " 'The purpose of impeaching evidence is to destroy the credibility of a witness and not to establish the truth of the impeaching evidence.' " *People v. Salgado*, 263 Ill. App. 3d 238, 248 (1994) (quoting *People v. Bradford*, 106 Ill. 2d 492, 499 (1985)). "The decision of whether or not to *** impeach a witness" is generally "a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel." *People v. Franklin*, 167 Ill. 2d 1, 22 (1995). This court has previously found that "[f]ailure to make use of obviously useful impeachment against a key State witness" was ineffective assistance of counsel, where the trial court expressly referred to the lack of impeachment to support its finding. *People v. Vera*, 277 Ill. App. 3d 130, 140 (1995). However, we will not upset a jury's verdict "on the possibility, not probability, that with a little bit more impeachment, the witness would have been found totally incredible." *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47.

¶ 94    At trial, Sergeant Wodnicki testified that he first worked on the robbery at the dealership on August 23, 2013, and that he could not recall when he first spoke with Helmstetter. On cross-examination, however, Suarez's counsel confronted Sergeant Wodnicki with his prior testimony that he had met with Helmstetter prior to that date. Suarez's counsel also attempted to cross-examine the sergeant regarding the video footage recovered from the dealership, and the sergeant denied that he was even aware of such footage. Suarez's counsel then elicited testimony from ASA Molesky that the video footage was available at the police station, and that she watched the footage in Sergeant Wodnicki's office. Defense counsel raised all of these apparent discrepancies in

closing arguments. Accordingly, contrary to Suarez's assertion on appeal, trial counsel did in fact challenge Sergeant Wodnicki's credibility based on prior inconsistent testimony and based on the dealership's surveillance video.

¶ 95    According to Suarez, however, trial counsel also should have impeached Sergeant Wodnicki with Detective Chopp's testimony. At trial, Sergeant Wodnicki testified that he learned Coleman's firearm was used in the robbery as a result of Suarez's statement. Additionally, Detective Chopp testified that he inventoried the firearm and sent it for processing on July 17. Suarez asserts that the detective's testimony establishes that Sergeant Wodnicki "would have known about" the firearm's processing. Yet nothing in this portion of Detective Chopp's testimony would have suggested that Sergeant Wodnicki also knew the firearm was used during the robbery. Accordingly, since the two testimonies are not clearly contradictory, we do not believe that Suarez's counsel could have used Detective Chopp's testimony to impeach Sergeant Wodnicki. We similarly reject Suarez's claims that trial counsel could have called Officer Tamlo to testify that the sergeant "gave him a specific time to go to the dealership when Mr. Suarez was going to be present," since he offers no testimony by the sergeant that would have contradicted this statement.

¶ 96    Additionally, Suarez claims that trial counsel should have impeached Sergeant Wodnicki with his own written statement. Specifically, Sergeant Wodnicki testified that Suarez recruited Coleman to assist in the robbery, while Suarez's statement stated that Harris recruited Coleman. Yet the primary evidence at trial linking Suarez to the robbery was Suarez's confession. Trial counsel's defense strategy was to call into question the legitimacy of this confession. We cannot conclude that trial counsel was ineffective for not raising the substance of Suarez's confessing statement in order to impeach Sergeant Wodnicki. To the contrary, trial counsel rightfully would

not have wanted to draw more attention to this statement, or to suggest that it was truthful. Thus, any failure to use Suarez's confession to impeach the State's witness was a clear matter of trial strategy and not deficient performance. *Manning*, 241 Ill. 2d at 327.

¶ 97    The record overall shows that Suarez's counsel extensively cross-examined Sergeant Wodnicki and questioned his credibility regarding multiple points. Thus, Suarez essentially disagrees with his counsel's chosen strategy in attacking Sergeant Wodnicki's credibility. We, however, cannot find trial counsel was ineffective based on a mere choice in trial strategy. *Id.* Moreover, we cannot reverse the jury's verdict simply due to the "possibility" that Sergeant Wodnicki's testimony would have been found "totally incredible" had defense counsel chosen a different route to cross-examine him. *Douglas*, 2011 IL App (1st) 093188, ¶ 47.

¶ 98    For these reasons, we will not reverse the judgment of the circuit court based on the assertion that trial counsel was ineffective for failing to adequately impeach the sergeant.

¶ 99                    D. Admission of Prejudicial Evidence

¶ 100   Throughout his opening brief, Suarez additionally asserts that trial counsel was ineffective for not objecting to a variety of remarks and testimony that Suarez deems prejudicial. Specifically, Suarez asserts that trial counsel should have objected to: (1) the State's remarks in opening statement and closing argument that Suarez operated as a member of a "team" and coordinated the robbery with his codefendants; (2) Sergeant Wodnicki's references to other offenders; (3) Sergeant Wodnicki's testimony regarding his physical observations of Suarez during his interview; and (4) Sergeant Wodnicki's statement, "Thank God Susie wasn't shot."

¶ 101   Initially we note that Suarez cites to no legal authority as to why any of this testimony should have been inadmissible. As such, this issue is waived for purpose of appeal. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (the appellant's brief shall contain "[a]rgument, which shall

contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); see also *People v. Johnson*, 385 Ill. App. 3d 585, 608 (2008) ("It is unnecessary for us to consider a point in an appellate brief that is unsupported by citation to legal authority of the factual record."), and *People v. Chatman*, 357 Ill. App. 3d 695, 703 (2005) ("A reviewing court is entitled to have the issues before it clearly defined.").

¶ 102 Nonetheless, regardless of waiver, we find no merit in any of Suarez's contentions. On appeal, Suarez only broadly asserts that the remarks and evidence were "prejudicial." However, our courts have repeatedly held that "[t]he mere fact that evidence may tend to prejudice a defendant does not render that evidence *per se* inadmissible." *People v. Nightengale*, 168 Ill. App. 3d 968, 973 (1988). Rather, "[t]he issue is whether the prejudice to the defendant is outweighed by the probative value of the evidence." *Id.*

¶ 103 In the present case, the State's theory against Suarez was based on accountability. To establish a defendant's guilt based on accountability, the State was required to show beyond a reasonable doubt that: (1) "the defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime;" (2) the defendant's participation occurred before or during the crime's commission; and (3) the defendant had "the concurrent intent to promote or facilitate" the commission of the crime. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). Thus, any evidence that Suarez collaborated with his codefendants to orchestrate the robbery would have been not only probative but necessary to prove the State's case. While Sergeant Wodnicki's exclamation that "[t]hank God Susie wasn't shot" contained little if any probative value, we cannot find that this single, passing statement would have altered the trial's outcome. Accordingly, we find that Suarez has failed to show that but for trial counsel's alleged failure to object to any of the

aforementioned evidence and remarks "the result of the proceeding would have been different." *Dupree*, 2018 IL 122307, ¶ 44.

¶ 104   We therefore affirm the judgment of the circuit court based on trial counsel's alleged failure to object to "prejudicial" remarks and testimony.

¶ 105                                  CONCLUSION

¶ 106   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 107   Affirmed.